GLICKSTEIN, Chief Judge,
dissenting.
I would reverse.
Appellee’s amended complaint alleged that the subject aircraft was not registered with the FAA and that the registration numbers on the aircraft, F-OGLX, were registration numbers from the Republic of France, but that “these specific numbers had never been issued or inscribed in the French Registry and that said numbers were therefore false.” It alleges Detective Sampson learned from Banyan Aircraft that the aircraft was owned by Inverest International, Inc., located at a North Miami Beach address; that he investigated and *555 found the address to be a private condominium; that he obtained the corporate address of Inverest International, Inc., from the Secretary of State, and found that the address was an office building which did not have a company called Inverest International, but did contain the registered agents for the corporation. The amended complaint made reference to sections 329.10 and 329.11, Florida Statutes (1987), but failed to allege that the parties in interest acted with any intent or guilty knowledge.
Section 329.10(1), Florida Statutes (1987), provides:
It is unlawful for any person in this state to knowingly have in his possession an aircraft that is not registered in accordance with the regulations of the Federal Aviation Administration contained in Title 14, chapter 1, parts 47-49 of the Code of Federal Regulations.
(Emphasis added). Section 329.11, Florida Statutes (1987), provides in pertinent part:
(1)(a) It is unlawful for any person, firm, association, or corporation to knowingly buy, sell, offer for sale, receive, dispose of, conceal, or have in his possession, or to endeavor to buy, sell, offer for sale, receive, dispose of, conceal, or possess, any aircraft or part thereof on which the assigned identification numbers do not meet the requirements of the federal aviation regulations.
(b) If any of the identification numbers required by this subsection have been knowingly omitted, altered, removed, destroyed, covered, or defaced, or the real identity of the aircraft cannot be determined due to an intentional act of the owner or possessor, the aircraft may be seized as contraband property by a law enforcement agency and shall be subject to forfeiture pursuant to ss. 932.701-932.704. Such aircraft may not be knowingly sold or operated from any airport, landing field, or other property or body of water where aircraft may land or take off in this state unless the Federal Aviation Administration has issued the aircraft a replacement identification number which shall thereafter be used for identification purposes.
(Emphasis added). Neither the trial court nor the parties had the benefit of this court’s subsequent holdings that similar statutes require an allegation and proof of guilty knowledge or intent. In the recent case of In re Forfeiture of One 31' Seahawk “Cigarette” Vessel, 572 So.2d 1038 (Fla. 4th DCA 1991), the seized vessel had no hull numbers, which was violative of section 328.07, Florida Statutes. We held that even though the statute made nonconforming craft “contraband” for the purposes of the forfeiture act, more than possession of a nonconforming vessel was required before it could be forfeited, saying:
For the vessel in the instant case to be subject to forfeiture, the City was required to allege either guilty knowledge or intent. The verified amended complaint does not allege that the owners “knowingly or intentionally concealed” the vessel or misrepresented the identity of the vessel in violation of section 328.-07(4)(b)....
Id. at 1040. In the similar case of In re Forfeiture of One 1987 Velocity 30' Go-Fast Vessel, 577 So.2d 678 (Fla. 4th DCA 1991), we again held that forfeiture of a vessel with faulty hull numbers required both an allegation and evidence of intentional wrongdoing.
It follows that with such an allegation of guilty knowledge that, (1) the issue of guilty knowledge or intent is squarely before the trial court; and (2) the burden of proof upon that issue is clearly upon the agency seeking forfeiture.
The trial court’s following remarks reflect an indication that the burden may have been placed on the party opposing forfeiture, and that the burden had not been met:
The claimant indicated throughout the case, and from the very beginning that he was going to be able to show that there was no way he could have done anything other than what he did in the process of bringing the aircraft or domesticating from French registry to United States registry. The evidence *556 has shown that there is all sorts of things that could have been done and it should have been done, and that the only reason for not doing it would seem to have some clandestine use, which I think is implied by the evidence in the case.
Moreover, the final judgment is void of findings of fact and conclusions of law; and the conscientious trial judge’s preceding and following remarks are somewhat speculative, given the draconian remedy of forfeiture to a governmental agency where there has been no allegation or proof of criminal conduct:
Looking backwards, after the date of seizure, and the documents that were filed, this story appears as [appellee’s trial counsel] has presented it. But, if in the earlier period of time after the airplane came back from Guadeloupe Air Cargo, it had ended up crashing in a remote strip, would the ownership have been traceable? And I think not.
In Cabrera v. Department of Natural Resources, 478 So.2d 454, 456 (Fla. 3d DCA 1985), the Third District Court of Appeal recognized that forfeiture is an extremely harsh penalty and that forfeiture statutes are to be “strictly construed in favor of the party against whom the penalty is sought to be imposed.”
As in both Seahawk and Velocity, the amended complaint in this case does not include any allegations of intentional wrongdoing. The record reflects that appellant knew the aircraft had neither French nor United States registration when he contacted Banyan to repair and register the aircraft. This was over a month prior to the seizure of the aircraft. Further, the record reflects that the FAA sent a letter to Inverest International, Inc., stating that the airplane could not be registered until certain documents were filed. While the record reflects that appellants knew the airplane was not registered, appellee was required to allege and prove appellants’ intentional act to conceal the owner’s identity.
EPILOGUE TO DISSENT
After all of us on the panel had completed our respective work on the majority and dissenting opinions, it became public knowledge that one of the appellants, Robert Streidinger, was to be a player in the Noriega trial because of reported drug smuggling activities.
This newly reported information had no effect whatsoever on the work of any judge on the panel as none of that information was in the trial record of the present case being reviewed on appeal. Accordingly, should the reader consider the dissent to be naive, as is the reader’s privilege, the reader does so without an understanding of appellate review of trial records, notwithstanding the foregoing explanation.
Something else occurred after our work was completed; namely, an extraordinary series of articles and editorials in The Stuart News on forfeitures, none of which had any effect on the decisions of any of us on the panel but which I believe to be important enough to call to the public’s attention. The articles, entitled “Presumed Guilty” were originally authored for The Pittsburgh Press by Pulitzer Prize winners Andrew Schneider and Mary Pat Flaherty of the Scripps Howard News Service. The series’ main point was the following:
A 10-month study by The Pittsburgh Press shows 80 percent of the people who lost property to the federal government were never charged. And most of the seized items weren’t the luxurious playthings of drug barons, but modest homes and simple cars and hard-earned savings of ordinary people.
Those goods generated $2 billion for the police departments that took them.
The owners’ only crime in many of these cases: they “looked” like drug dealers. They were black,. Hispanic or flashily dressed.
Others have been connected to a crime by circumstances beyond their control.
Says Eric Sterling, who helped write the law a decade ago as a lawyer on a congressional committee: “The innocent-until-proven guilty concept is gone out the window.”
*557 Rooted in English common law, forfeiture has surfaced just twice in the United States since colonial times.
In 1862, Congress permitted the president to seize estates of Confederate soldiers. Then, in 1970, it resurrected forfeiture for the civil war on drugs with the passage of racketeering laws that targeted the assets of convicted criminals.
In 1984, however, the nature of the law was radically changed to allow the government to take possessions without first charging, let alone convicting, the owner. That was done to make it easier to strike at the heart of the major drug dealers. Police knew drug dealers consider prison time an inevitable cost of doing business. It rarely deters them. Profits and playthings, though, are their passions. Losing them hurts.
And there was a bonus in the law: The proceeds would flow back to law enforcement to finance more investigations. It was to be the ultimate poetic justice, with criminals financing their own undoing.
Because money and property are at stake instead of life and liberty, the constitutional safeguards in criminal proceedings do not apply.
The Stuart News, September 1, 1991, at section A5. Episodes from the series suggested a number of conclusions and examples:
1. Each year, in the drug war, thousands of guiltless citizens are stopped, often because of their skin color. Seventy-five percent of the people stopped in the Memphis airport were black. In Pittsburgh’s airport, in 1990, 527 people were searched and forty-nine arrested. In Buffalo’s airport, in 1989, 600 people were detained; and only ten were charged. Id. September 1, 1991, section A4.
2. Drugs can be found in almost all of our currency. Ninety-six percent of bills tested from eleven cities tested positive for cocaine. Id. at A4.
3. There is no single profile of a drug runner. Id. at A4.
4. Informants were paid $24 million in 1990 by the U.S. Justice Department. Among the best paid are dealers and users. The Stuart News, September 2, 1991, at section A7.
5. Seizures on sketchy or perjured information leave the property owner or heirs of deceased owners with the burden of effecting the return or freeing up of the property. Id. at A7.
6. A Nevada couple lost their air charter business because of a seizure, unproven charge and a zealous federal prosecutor. The Stuart News, September 3, 1991, section A6.
7. Community outrage prevented seizure of a couple’s farm in Vermont. Id. at A6.
8. Iowa spent $100,000 defending the seizure of a $6,000 boat. Id. at A6.
The Stuart News’ concurrently running editorials pointed out the following:
The Schneider-Flaherty team’s 10-month investigation documents over 400 current cases of innocent people forced to forfeit money or property to federal authorities. These victims are farmers and factory workers, small business owners and retirees. Often, their only offense was exhibiting behavior or personal traits considered typical of drug couriers.
But even among people convicted of crimes, some penalties were wildly disproportionate. Should a family be permanently robbed of the farm that is its home and livelihood because six marijuana plants were found growing in a field?
The Stuart News, September 1, 1991, at section A8.
As the continuing Pittsburgh Press-Scripps Howard News Service series “Presumed Guilty” makes clear, something is seriously amiss with federal and state seizure laws. The incentives are all wrong.
It’s not news that people alter their behavior in response to legal incentives. As currently written, the seizure laws serve to push police and police informants toward irresponsible acts, working *558 against the right of the people “to be secure in their persons.”
The Stuart News, September 2, 1991, at section A14.
The examples offered in “Presumed Guilty” are devastating. In a profile used in one state, a person becomes suspect if he deplanes ahead of other passengers; in another state, a suspect will be the last off the plane; in a third state, someone in the middle of disembarking passengers raises eyebrows.
This suggests profiles are merely rationalizations for an officer’s intuition, allowing his own prejudices to substitute for bona fide legal procedure. If so, their use should be discouraged, particularly when they are used as cover for singling out citizens on the basis of race.
As federal judge Jim Carrigan puts it: “If the rule of law rather than the rule of man is to prevail, there cannot be one set of search and seizure rules applicable to some and a different set applicable to others.”
The Stuart News, September 3, 1991, at section A10.
The approximately 100 state and federal forfeiture laws were meant to be a useful tool for beleaguered police. But the tool offers too much power with too few constraints.
The missing element that Congress must restore is due process.
The Stuart News, September 4, 1991, at section A8.
Finally, the public should be aware that after our work had been completed, the Florida Supreme Court decided Dep’t of Law Enforcement v. Real Property, 588 So.2d 957 (Fla.1991), upholding the constitutionality of the Florida Contraband Forfeiture Act, but saying:
In evaluating the due process concerns, it is clear that individuals have compelling interests to be heard at the initiation of forfeiture proceedings against their property rights to assure that there is probable cause to believe that a person committed a crime using that property to justify a property restraint. Property rights are among the basic substantive rights expressly protected by the Florida Constitution. Art. I, § 2, Fla. Const.; see Shriners Hosps. for Crippled Children v. Zrillic, 563 So.2d 64, 68 (Fla.1990) (article I, section 2 protects all incidents of property ownership from infringement by the state unless regulations are reasonably necessary to secure the health, safety, good order, and general welfare of the public).
Id. at 964 (footnote omitted).